Please be seated and be happy in Forest Capital v. BlackRock to hear from Mr. Wurst. Good morning judges, if it may please the court. There are four issues I would like to highlight to this distinguished court. First, the effectiveness of the notification. Second, the ineffectiveness of the anti-assignment provision contained in the control agreement. Third, Forest's interest in funds to be released to People's Power and Gas, the payment intangibles as we've referred to them. And fourth, that use and benefit is not a required element of a conversion claim under Maryland law. First, notification. The most critical protection afforded in accounts receivable financing, whether it's factoring or asset-based lending, is the right to place account debtors on notification. This is to assure that the account debtor must pay the factor, even if it has intentionally or unintentionally paid the borrower. It's often the creditworthiness of the account debtor that induces the factor to make advances to its client, even when the client itself is less creditworthy. BlackRock admits to having received the notification and afterwards having made at least one payment in accordance with the notification. The district court, I think, thought that the notification was very vague. That's what the district court held. The case we recently submitted under Rule 28 for guidance from I don't understand why that wasn't correct, that Blackwell, the district court says Blackwell wasn't sure that they even, that they received adequate notice of your security interests. The letter never began to explain what financing arrangements there were between PPG and Forrest. If Blackwell never received notice of Forrest's interests, then how could BlackRock be held liable? I mean, as a threshold matter, it would have to receive some clear notice of the interest that Forrest had in the account, would it not? Well, yes, the notification, we believe, is clear on its face. It doesn't have to go into detail. For example, once, once Well, could you read me the portion of the notice that you think put Blackwell on notice? Certainly. It says, and this is in the record, the JA-48 I'm reading from. PP&G has granted Forrest a security interest in substantially all of its assets, including but not limited to payment intangibles, which may be owed at any time by BlackRock to PP&G, including the return of any deposits or any part thereof given by or on behalf of PPG to BlackRock. Accordingly, this shall serve as notification and authorization that you are to remit to Forrest all monies that may or may become payable by BlackRock to PP&G. This instruction cannot be changed except by a writing duly executed by Forrest. Now, if if BlackRock questioned or wanted more information, 9406C of the UCC gives them the right to ask to see. Let me see the security. Let me see the documentation. They didn't exercise that right. They didn't ask, nor did they do what an account debtor who is uncertain what to do. They didn't do that, which would be to bring an action and interpleader. What they did do, however, was take it upon themselves to make the payment to PP&G after they had the notification. So even if the notification was ambiguous, the issue is whether it provided reasonable notice. And I think the Texas Court of Appeals in the case that we recently sent over to you highlights the reasonableness. And that's that's been the standard throughout Maryland. It's the standard throughout the country where the UCC is adopted. Essentially, that the fact that BlackRock made the initial payment in accord with the notice indicates that they that they certainly understood what they were being asked to do. Yes, they they abided by it. They made they made that payment. They've never explained why they didn't continue to follow those instructions. What about the district court's contention that there was a requirement that the notice be countersigned? Thank you, Judge. There is no such requirement under the UCC. Now, candidly, in notification, the way this will work very often is a borrower doesn't want to make it look like he's in trouble with his with his lender. And so the drafters of revised Article 9, which was adopted, became effective in July 2001, took away any requirement that that the lender, the assignee, might have to sign. So under 9406, the the the notification can come from either the assignee or the assigneur. Now, sometimes we see it come from the assigneur, and sometimes we even see the assigneurs, the assigneur and the assignee joint sign it. But it's not necessary. The the section of the UCC is very clear. It's either it could be sent by either the assignee or the assigneur. In this case, it was said by the assigneur, by PPNG. It was it was effective notice. And and the court below made an error. Mr. Worse, I have a little bit of a more fundamental issue with your claims in this case. And that if you read me, my reading of the UCC provisions that you're relying on simply do not expressly or by implication purport to provide a cause of action, a private cause of action. What's your response to that? I mean, there may be another claim out there somewhere based on what happened here, perhaps a breach of contract claim, for example, under the common law. But I don't see anything in the statutory language of these provisions that purport to give your client a right to sue. I believe 607 does give the express right, but for 406 does not address that. But case law has the the platinum funding case that came out of Texas. I'm sorry, that came out of Connecticut. I believe holds that that there is an independent cause of action. And granted, it's rare that we'll see an independent cause of action. We have tied that cause of action. You know, there are other causes of action in our complaint. The the conversion in particular. So taken together. Yes, typically we'll see them taken together. Most typical situation where you'll see enforcement would be when a lender steps into the shoes and brings a good sold and delivered action against an account debtor. But these are very unique facts. This is a very rare situation. So we have the conversion claim, but we do maintain that that the drafters of the UCC would have not put that provision out there without giving without the intent of it having an independent cause of action. As as the Connecticut court held in the platinum funding case. So the point is made that BlackRock is a stakeholder here, but PPG set up the account. And so PPG is is BlackRock's customer here. And normally when a customer sets up an account, the fiduciary of the account is obligated to take instructions from the customer who which was PPG. And the I kept reading this case and I thought, well, gosh, your real beef ought not to be with BlackRock, but with PPG. Because PPG was the one that was unlike BlackRock, PPG had a had full notice of its account with BlackRock. And PPG also had notice of what full notice of what its relationship with Forest Capital was. In other words, PPG knew all the players and it had it had the landscape in front of it. And if PPG directed BlackRock to make unauthorized payment to itself in part, that's PPG's problem for overdrawing the account. But I'm just not sure how Forest Capital gets into it legally. I understand that they may be a deeper pocket or PPG is in bankruptcy or whatever. I understand practically how they get into it, but I don't understand legally how they get into it without subjecting stakeholders, which are just banks and savings and loans and financial institutions nationwide, without putting without stakeholders. They're going to be very reluctant to even follow the directions of the people who set up their accounts. And that puts them in and in quite a difficult position, an untenable one, I would think. Well, in this case, PPG gave an instruction. PPG said you are only to pay Forest and this instruction cannot be changed except by a writing. So BlackRock was on notice of that. And what you're focusing on, Judge Wilkinson, is exactly the heart of Sections 9406 and 9607. Because without notification, lenders could not make asset based lending. They could not factor because those borrowers tend to be less credit worthy and desperate people do desperate things. So to protect against that, the UCC has always provided for notification. Revised Article 9 in 2001 breaks it into two pieces, 9406 and 9607. But that is exactly what 9406 is out to avoid, having someone pay the wrong party. And yes, BlackRock says it's there to be a defense, but they don't have that defense because they paid the wrong party. They were on very clear notice that they were to pay Forest and that instruction could not be changed. Nobody put a gun to PPG's head to make that change. But because borrowers may go into bankruptcy and there'll be no other way to recover the loan, the reason the loan was made to PPG was because it was somewhat less than credit worthy. So you have to look to the account debtor. BlackRock did not, if BlackRock did not want to make the payment, they should have brought an action in interpleader. They didn't do that. They paid the wrong person, and as a result, they were not discharged of their obligation to pay Forest. Now, you highlight savings and loans and banks, and there's a difference between BlackRock and banks and savings and loans. Banks are specifically excluded from being an account debtor. Financial intermediaries, securities intermediaries, if that is what BlackRock is, and they've only said it in their papers and they haven't shown anything because we haven't gotten that far in the case. But assuming argument, that's what they are. The drafters of the UCC and the various legislatures that adopted it did not carve out an exception for anyone other than banks. So BlackRock is an account debtor, and they did not abide by what they had to abide by under notification. And as a result, they must pay the price. As far as pursuing others, yes, obviously Forest is pursuing what it can recover from the PPG bankruptcy state, but it will come up short. Thank you, and you have some rebuttal to have. Thank you. Mr. Dewey. Good morning, Your Honors. May it please the Court, Tom Dewey for BlackRock. Forest is asking this Court to adopt a theory of liability that no federal court, and certainly no federal court of appeals has ever adopted, and that if adopted would significantly threaten the functioning of the securities markets in this country, as pointed out in the SIFMA brief. This case was properly dismissed for many independently sufficient reasons, and we therefore respectfully submit the Court should affirm Judge Mott's. I'd like to start, if I may, with Judge Diaz's comment about the lack of a cause of action in 9406. 9406, exactly as you said, Your Honor, simply doesn't create an independent cause of action. This Court made exactly that observation about the entirety of Article 9 in the SSMC case, where the Court said Article 9 does not create a cause of action for any secured party. The platinum funding case that Mr. Wurst referenced says exactly the same thing. It says it does not provide a cause of action, absent some independent right of recovery, and expressly rejected the very novel theory that's being advanced. What if we agree with you on that point, but looking at the four corners of the complaint? In fact, I think you all might have suggested this, that the better pled claim might have been for a breach of contract, given the assignment of the right to payment of funds. The law, as I understand it, doesn't necessarily penalize a party for mislabeling a claim. Why can't we simply say, all right, they didn't label it as a breach of contract claim, but this is essentially what this is, and we ought to let it go back to the District Court to sort it out? I've never heard any plausible breach of contract claim, and I'd like to point out, if I may, that this complaint was their second bite at the apple. It was a prior litigation. So you've never heard any plausible breach of contract claim, but I think your brief suggested that that might have been the proper claim. If we did, that was not what we meant to suggest, and there's never been any suggestion of what a plausible breach of contract claim might be. Well, there's been an assignment of the right to payment under that notification, either under the terms of the master partnership agreement or the control agreement, and your client breached that provision by failing to make the appropriate payment to the other side. That claim was never made. It was never given to Judge Motz in any proposed amended complaint. They completely failed to comply with the obligation under the rules of the proposal. Well, but they did ask for the right to re-plea. In a boilerplate, one paragraph at the end, tacked on without an amended pleading or without any suggestion of what the amended pleading would say. But if I can go on, even if that claim were pled, the 9406 and the 9607 claims still have to go for a whole bunch of different reasons. The fact of the matter is we are not, as a matter of law, an account debtor. It's absolutely critical to understand that we are not obligated on an account, chattel paper, or a general intangible. The drafters of the UCC expressly excluded investment property, which is what's in the account, money market securities, from each of those terms, so that that provision, and the same is true of 9607, could never apply to us. And this raises the broader issue that they're trying to fit a round peg into a square hole. We're a securities intermediary. That's what the account documents say. We're governed by Article 8 of the UCC, not Article 9. And Article 8 of the UCC gives us the right to rely on, to the point that Judge Wilkinson was raising, the instructions of our customer. For example, 8.1.15 says a securities intermediary like us is not liable to a third party if you follow the customer's instructions, absent legal process or some claim of collusion. That's all we were doing. We were following our customer's instructions, which is what we were entitled to do, and indeed required to do under the UCC. More to the point, Section 8.1.12 expressly says that a creditor like Forrest can't gain an interest in a security entitlement except through legal process. So what they're doing here is they're trying to use these provisions of Article 9 to do an end run under the very clear provisions of Article 8. And the policies of Article 8 are very, very important here because securities are different. We have to be able to execute trades immediately without making inquiries into the claims of competing creditors, which is exactly what Forrest suggests we're required to do. Your client did make one payment, correct? We made a payment to Forrest, but that payment to Forrest was completely in conformity with the account document. That is to say, it was a request from our customer, PPNG, countersigned by New England ISO, which is the preexisting secured creditor, that we wire money to Forrest. So we wired money to Forrest because of that. So you were following your... Absolutely. Did that instruction also tell you about how that could be amended, that could be countermanded? It was simply a redemption request, Your Honor. In other words, it was a one-page redemption request. It didn't say it couldn't be modified. It said nothing of the kind. It was simply a request in accordance with the account documents that we wire these money market funds to Forrest, which we did. And that was separate and apart from this purported notice that the other side is relying on? Exactly. So you say that notwithstanding that notice, you had a right to ignore it if your customer told you to do something that was inconsistent with the... Well, I'll get to the point about the insufficiency of the notice. But Article 8 of the UCC says we're entitled to rely, indeed must rely on the instructions of our customer. And in the comment to... Well, I guess the instructions of your customer are a little bit contradictory here, right? Because they say earlier that you're not to revoke the purported notice until you receive consent by the relevant parties, and then you receive a notice later on that is in contradiction to that. So what is your client supposed to do? Our client is supposed to follow the instructions of our customer. Which ones? Our customer. No, no, Forrest has never been a customer. Part of the problem here is we have no legal relationship with Forrest. We have no idea who they are. There's not even any contact details in the notification piece. If I may, 8503 sort of expressly anticipates this situation. You never had any contact at all with Forrest? We got a notification letter from PP&G on which Forrest was not copied and there were no contact details or anything from Forrest. And 8503 says rather than... There have been no conversations? Nothing. And we got a one-paragraph letter on Christmas Eve. But you got a notification from your customer? Yes. Correct? We got a letter from our customer. To do what? Well, what it told us is an interesting thing. What it said was there are these financing arrangements out there, but it didn't attach to financing arrangements. Don't tell me what it didn't tell you. Tell me what it told you to do. It said that pursuant to certain financing arrangements, that Forrest had an interest undefined in some or all assets of PP&G, right, without copying Forrest without the request being from Forrest and didn't ask us actually to redeem or do anything at that time. All right. That's all. That's all. That's all the notification you got. Right. And if I may, Article 8 expressly anticipates this piece in saying rather than imposing duties to investigate, the general policy of the commercial of the law of the securities holding and to transfer system has been to eliminate legal rules that might induce participants to conduct investigations of the authority of persons transferring securities on behalf of others for fear they might be held liable for participating in a wrongful transfer. Well, I mean, that would be the upshot of the rule that the appellant wants, and that is before you follow the instructions of your customer, you would have to, you know, do a full investigation of every possible creditor of your customer. And, you know, the universe of creditors is large. It is indeed. And what this is, you know, it goes against the basic thrust of the code, which is to remove restraints on alien ability to facilitate the free flow of capital and the rest. And the code, if it does one thing, it doesn't try to jam things up with all sorts of investigations and private causes of action at every turn because it realizes the overall impact upon commercial life that that would have. And, you know, I don't, the burden isn't on you to conduct a full-scale investigation of anybody, any conceivable creditor that may have an interest in PPG's assets and through PPG's assets in the BlackRock account. I mean, that puts, that's the kind of thing that really puts a wrench in financial dealings. I mean, it's their obligation to spell out for you what you're supposed to do in terms that were far more definite and clear than were ever made here. I think that's exactly right, Your Honor, particularly for someone, as you pointed out. You're in an impossible situation. And we're in exactly the position that the drafters of Article 8 anticipated and concurred with Your Honor that in the particular circumstance of securities, this is different. In other words, you can't put that sort of burden on us if the security system is going to work. And as Your Honor also previously pointed out, we are simply an agent here. We are not the real party in interest. You need look no further than their complaint where they accurately say that we were holding the funds on behalf of our customer, PP&G. Don't you have an obligation to your principal to follow the principal's instructions? We absolutely do. We must follow the instructions of our principal. Well, the instructions in this notice said that you are to remit to Forrest all monies that may be or may become payable by BlackRock. That was their instruction. What is so difficult about that or confusing? As a practical matter, it didn't ask us to do anything. But assuming that it was sufficiently specific, that was a valid instruction. Then the instruction was changed. So we have to follow our customer's instruction, period, full stop. Particularly since we're only a stakeholder, as Judge Motz properly observed. Even in the face of language that says that you can't follow that instruction unless you receive notice by a third party. We have no idea who the third party is. We have no relationship. You were told who the third party was. We're told that they're Forrest Capital, but we have no idea of what interests they actually have. We have no idea, in particular, as to what their interests are vis-à-vis New England ISO, which is the pre-existing secured creditor. And our customer, being our customer, has the right to give us difference instructions, which we are compelled to follow under Section 8 of the UCC. On the agency point, I might add that we cited at length the nationwide case from the Ninth Circuit that says nothing in the language of 9406 or any judicial decision interpreting that section supports the notion that a payment agent, us, of the account debtor, has the same obligations as the account debtor. We cited the case prominently in our brief. It's not mentioned or distinguished anywhere in their reply. I think we've covered the point on no reasonable identification of the rights. The only point I would add there is that the UCC spells out a suggested form of notification of rights, which says, not surprisingly, that you should attach the documents, which weren't attached, and does strongly suggest that the actual secured creditor countersign the documents so that, as a practical matter, one could actually get in touch with the secured creditor if there were an obligation to do that. Our arguments on 9607 are broadly similar. It's even clearer if you look at the language of 9607 and the comments to 9607 that there's no freestanding cause of action. It says that the section doesn't determine whether an account debtor, bank or other person obligated on collateral owes a duty to a secured party. We have the image point case from the Southern District that says flat out section 9607 doesn't create any obligation to a secured party. I do want to address both in the context of the UCC and this notional breach of contract claim, 9607, the idea that Forrest, as the secured creditor, stepped into PP&G's shoes and had the right to the funds in the account. If that's right, which of course we deny, they're bound by all the terms of the account. And the account document contains a broad general release of BlackRock from any liability. So they can't have it both ways. They can't step into the shoes of the account and have the right to the money in the account and then not be bound by the release from liability that the account holder gave us. Is that something that can be resolved at the 12B6 stage? In fact, the account documents have been in the record for a long time. Again, this goes back to the earlier point that there was a prior litigation. There was a TRO application which Judge Motz granted to Forrest. It was a fully briefed motion for a preliminary injunction where we raised many of these arguments along with our co-defendants. The matter was resolved. And in the course of that preliminary injunction briefing, the control agreement, these documents were put in the record, and there's no dispute about what happened. And there was a stay motion as well. So these documents have been in the record for a very long time. And, of course, the account and the rights in the account are expressly referenced in the complaint. Similarly, we're not an account debtor under 9607. And the last point on 9607 is that 9607 is very clear that it's the secured party that can send the notification. That's what the statute says. And, of course, when the statute's clear, the court should simply apply the statute. Now, my colleague, Mr. Wurst, says, well, the statute says the secured party may send a notification, pointing out it's permissive, which is exactly right. Secured creditors are under no obligation to send a notification. But what it manifestly doesn't say is that the notification can be from the account debtor. So that argument alone, I think, dooms their 9607 claim. Lastly, on the conversion point, I would point out that they have simultaneously sued three different people for converting the exact same funds. They have a claim for PP&G for converting these funds. They have a claim against PP&G's CEO, Mr. Pearsall, for converting these funds. And they have a claim against us for converting these funds. So I think it's fair to say that various different versions of the facts are being alleged. But the conversion claim fails for many different independently sufficient reasons. The first is that we never had dominion and control over these funds. We were, as we've discussed, simply an agent following instructions from others. The suggestion is made by Forrest that because we had the power to transfer funds, we did have control, but every court of appeals that has looked at that sort of argument has expressly rejected it. That's the Cootee case from the Fifth Circuit. It's the Ogden case from the Tenth Circuit, which say, if you're an escrow agent, if you're a securities intermediary, simply because you have the right to transfer the funds to someone else at the instructions of your customer doesn't give you the dominion and control that is required for a conversion claim. Similarly, there's no unlawful interference with their rights. There's no wrongful conduct pleaded here because we were simply following our legal obligations under the control agreement and under Article 8. The last point is, and you don't need to get there, what they're claiming is being converted are payment intangibles. You heard my friend, Mr. Worst, talk about payment intangibles. And, of course, the law in Maryland is you can't convert intangible property. They've tried to bring themselves within exceptions to that rule for specific segregable funds, but these funds were never segregated and they're now gone. They don't address also our argument that the funds or what needed to be converted would need to be merged into a transferable document. Maryland law is very clear on that point as well. There's no allegation that that ever happened, even though we've been attacking their conversion claim since the preliminary injunction motion on their original complaint. Lastly, I'd like to address... What facility did you transfer the funds to? Pardon me? What facility did you use to transfer the funds to PV&G? I believe it was a wire transfer yard. And you said that's not meet the standard for conversion. That's right. That's right. It's not sufficient under Maryland law for conversion. So you can't convert funds, money? Exactly so. The last point I'd like to make is the policy point here, which is made by both Mr. Wurst and the Commercial Finance Association about this significantly impinging creditors' rights. The fact of the matter is Forrest had a whole bunch of remedies here. They could have put a lien on the account. They could have picked up the phone and called BlackRock and said, look, we believe we have a right to entitlement to these funds. We need to do a control agreement. We need to talk about the competing rights to these funds. They could have, as they ultimately did, go and seek and indeed receive from Judge Motz a temporary restraining order. The second that happened, BlackRock froze the account. So there are lots of things that a creditor can do. You don't want to get into best practices, do you? You could have done something, too. You knew who Forrest was, didn't you? Because you'd already sent him money before. Well, we knew what Forrest's bank account transfer was, but we had no idea what actual rights Forrest had. It doesn't matter. It doesn't matter. Your customer told you to send the funds to them and that this instruction to you cannot be changed without Forrest giving you written instruction. In a writing that wasn't even signed by Forrest, copied by Forrest. It doesn't matter. You can't have it both ways. You said your customer, that's where you got your marching orders from. Your customer told you to do this. And we did. And then the customer told us something different? No, no, no, no, no. The customer told you exactly. It said, listen, a customer can always give up a right. Otherwise, it would be. If they said this and said no more, right, tomorrow I change my mind. But it didn't. It accounted for that. In the future, you have to get Forrest in writing to change this. It's clearly for the protection of Forrest. They gave that write-up. Your customer gave that write-up, that choice that they would have for future change of mind, they gave it up themselves, and you knew that in writing. Is that correct? We certainly knew that the notification letter said what it said. The point we're making, however, is that notification letter was on its face insufficient to get the rights that Forrest says it has in the account. If that notification letter is sufficient, no securities firm is ever going to be able to rely on its customer as it, in our case, was bound to do under the control agreement and had an obligation to do under Section 8. I don't follow the chicken little argument you're making. If you have these instructions, how is that going to burden you? Your customer told you, give the funds to A, and I can't change that instruction I'm giving you now unless A says in writing otherwise. What's so difficult about that? When we get an instruction from our customer to redeem funds and send it back to PP&G, we would then be compelled by virtue of a one-paragraph letter that is extraordinarily unspecific to make the exact same inquiry that the drafters of Article 8 of the UCC say we should not be compelled to make. Inquire what you need. We then need to go back to our customer and say, who is Forrest, where are they, is this countersigned by Forrest, what are Forrest's rights vis-à-vis New England ISO, which already has a security interest in the account and who Forrest admits is ahead of it in line. We have to make the inquiry between competing creditors that slows down the security system and prevents us from relying on our customer, which is what we were entitled to do. You just said no notification is sufficient there. No, there are certainly things they could do. They can get a TRO. They can put a lien on the account. There are lots of lawful remedies. No notification, that's a lawsuit. Or a lien or picking up the phone and negotiating a control agreement. There are lots of remedies they have that would have protected their rights. The remedy they do not have against BlackRock in these circumstances is sending a one-paragraph letter that, in essence, tries to jump in line in ways that are inconsistent with both our contractual obligations as an intermediary and with the policies underlying Article 8. The Court has no further questions. I thank you very much for your attention. Thank you. Mr. Morris. Thank you. The issue we're focusing on, as I said when I began, goes to the heart of commercial finance. In this case, BlackRock was one account debtor. But there were other account debtors on the PPG account. Every account debtor had to pay Forrest. In fact, there were probably thousands of account debtors. The other account debtors did not protest. They made their payments to Forrest. That's how commercial finance works. And this is a very important jurisdiction. Certainly one of the most prominent banking centers in the United States is within this circuit. And so commercial lenders are carefully watching this case. Mr. Morris, when you say other account debtors complied with the request for payment to Forrest, did they do so in the face of a subsequent instruction by PP&G not to do that? I mean, that's what happened here, right? Judge, I don't think we can prove a negative. We're not aware of any negative instruction that went from PP&G to any other account debtor. But even when that happens, that's what 9406 and 9607 are about. This country survives on commercial lending. When any purchaser of goods receives a notification in commerce, they know to pay the factor. They know to pay the asset-based lender. That is commercial finance. Unless it's countermanded, right? Well, if it's countermanded, what does an account debtor do? A reasonable account debtor says, wait, I'm not paying anybody. That's not what BlackRock did here. Or a reasonable account debtor says, you know, I'm sitting with a hot potato. Let me go and interplead these funds. That's what interpleader actions are for. But BlackRock did not do that. BlackRock took it upon itself to accept a change direction, assuming. But also, let's not confuse the rights of the New England ISO, of NISO. NISO released its interest. This was no longer collateral for NISO. NISO had signed off, this money can be released. And so NISO no longer had any interest. So what happens? It then kicks into the notification. Funds released. Any funds to be sent to PP&G are to go to BlackRock. I'm sorry, to go to Forrest. The conversion claim. The court below held and dismissed on the ground that we didn't plead use in benefit. But this court, as recently as January, applying Maryland law in the Hall v. Graystar case that we also pointed out under Rule 28, makes it clear that use in benefit is not required to be pled nor proven. That's just not an element of conversion under Maryland law. So Judge Motz made an error on that. We believe he made an error on the reasonableness of the notification. It was clear error. He also determined incorrectly that the funds at BlackRock were prepayments when they were not prepayments. Yes, in negotiating the security agreement, BlackRock wanted to distinguish between prepayments for energy and collateral security. Prepayments were when they went to other providers of energy. The whole case comes down to whether the notice and instructions to BlackRock were sufficiently clear to apprise it of its allegations? Judge, they don't have to be crystal clear. That's not the standard. They have to be reasonable. It has to put the account debtor on reasonable notice. And contrary to Mr. Dewey's argument that they were not an account debtor, the UCC is clear. Banks are accepted from the only exception to account debtors are banks. Banks are under Article III. They're under Article VIII. He says his client is under Article VIII. The drafters did not choose to exempt financial intermediaries. But banks, they did choose to exempt. When you go back on this reasonableness, conceding you could have done a lot more to apprise BlackRock what the situation was. Judge, I think we as lawyers, that's why we never finish a brief. The brief is never finished. It just has to be filed. We've never read anything that we can't make better. The basic problem I have here is whether a stakeholder is clearly apprised of what the landscape is here and what actually it's supposed to do. And the question of clarity comes in two points. Was the notice clear to BlackRock, a forest interest? And were the instructions clear? And my problem is in reading over this, I thought there was a lot of ambiguity and a lot of fog. And I would hate to have been someone in BlackRock's shoes who was facing legal liability with such a vague and foggy idea of what we'd have to do. I don't have any problem with the general proposition that BlackRock's supposed to follow PP&G's instructions or that BlackRock's on the hook if it's notified perhaps of what forest interest is. My problem is it's just all so loose. It's just all so vague. Judge, respectfully, you are to remit to forest all monies that may be or may become payable by BlackRock to People's Power and Gas. This instruction cannot be changed. If that's vague, then at the very least it's still reasonable. And before BlackRock took it upon itself to pay the wrong person, they either should have paid no one or they should have come to a court and bring an interpleader action. That's what account debtors do in that situation. Should have, would have, could have. I mean, you say BlackRock could have done this. You know, your opponent's argument was filled with things you could have done. I mean, not the temporary restraining order probably you didn't need to do, but file some sort of lien or what have you. I mean, both of you are saying, well, you both have plenty of options. But it comes down to this, to some sort of clarity. I mean. Perhaps we're really saying the same thing. Forrest did file its, Forrest did file its liens. Forrest is duly perfected. Forrest's liens were, and we're not asking the BlackRocks of the world to research everyone they do business with. Just. No, we're not. We're saying read the letter, read the letter. And if you're in doubt, don't pay, don't pay the wrong person. Because if you pay the wrong person after notification, you will not be discharged from your obligation. BlackRock was not discharged from its obligation to pay. Let me just add, I know we've spent, I'm a little bit over, if you'll indulge me one, just one statement more, please. Hurry up, because we've given you extra time. I'm trying, thank you. Finally, we submit that under Iqbal and Twombly standard, the complaint contains sufficient factual matter, which must be accepted as true to state a claim for relief that is plausible on its face. This case, remember, there was no answer. The facts that Mr. Dewey states. You're taking advantage of the additional time I gave you, and, you know, and particularly on a reply argument where the other side is not available to rebut it. Well, this is all, I believe, what we came up before. But I think the final statement is this case should not have been dismissed. There has been no answer. Let's give it an opportunity to flesh out to see if any of those facts really stand up. Thank you for your time. We will come down and greet counsel and move directly into our next case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Albert Diaz